IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| A.M., a minor, by and through her mother, SHAEL NORRIS, <br><br> Plaintiff, <br><br> v. <br><br> CAPE ELIZABETH SCHOOL DISTRICT, DONNA WOLFROM; Superintendent of Cape Elizabeth Schools, JEFFREY SHEDD, Principal of Cape Elizabeth High School; and NATHAN CARPENTER, Vice Principal of Cape Elizabeth High School, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) Civ. No. 19-cv-__ ) ) ) ) ) ) ) ) |

## **VERIFIED COMPLAINT**

### **Introduction**

1.      A.M., the plaintiff in this first amendment free speech and anti-retaliation case is a student activist with a long record of public advocacy on the issue of sexual violence in schools. When, on September 16, 2019, A.M. placed a post-it note in a girls' bathroom reading "There's a rapist in our school and you know who it is," her intent was to raise awareness of the dangers of sexual violence in the educational setting and to motivate the administration at Cape Elizabeth High School to take action.

2.      The activism succeeded in gaining awareness. School officials initially interpreted the note as an anonymous Title IX report and a criticism of the school's handling of sexual assault claims across the board. In addition, the Portland Press Herald contacted A.M. to

discuss the note and prior student advocacy to convince the school district to adopt improved policies and training for reporting and investigating sexual assault.

3. The same day that the Portland Press Herald issued its article, however, the school district disciplined A.M. with a three-day, out-of-school suspension. Notwithstanding their initial understanding of the note, school officials later claimed that the note qualified as bullying, arguing that the post-it note could only have referred to one person and that, by posting the note, the plaintiff had deprived that individual of educational opportunities.

4. The plaintiff did not intend to refer to only one person and did not direct the note at any one person. Rather, multiple survivors had told A.M. of multiple different alleged perpetrators and she wrote the note to draw attention to the problem of sexual violence and safety in schools more generally.

5. In punishing the plaintiff for protected speech on a topic of immense public concern, the defendants violated her rights guaranteed under the First Amendment. The First Amendment does not permit schools to punish students for protected speech simply because the speech is critical of the administration, nor does it permit the school to punish a speaker simply because the topic of their expression is controversial.

6. By punishing the plaintiff for reporting on incidents of sexual violence by members of her school's community, the defendant also violated the anti-retaliation provision of Title IX of the Education Amendments Act of 1972.

7. Plaintiff seeks preliminary and, thereafter, permanent injunctive relief to vindicate her right to continue to engage in expressive activity on the topic of sexual violence in school, including leafleting, and to prevent the school's retaliatory and punitive measures, including her three-day suspension and prohibition on further speech "of this sort."

## Parties

8.  A.M. is a 15-year old sophomore at Cape Elizabeth High School ("CEHS") in Cape
    Elizabeth, Maine. A.M. lives with her family in Cape Elizabeth, Maine. She is
    represented by her mother, Shael Norris.

9.  Cape Elizabeth School District ("CESD" or "the District") is a political subdivision of the
    State of Maine. CESD has its principal place of business at 320 Ocean House Road, Cape
    Elizabeth, ME 04107.

10. Donna Wolfrom is the Superintendent of the Cape Elizabeth schools. Pursuant to the
    district's bullying policy, Superintendent Wolfrom is tasked with reviewing appeals of
    discipline imposed under the bullying policy and issuing the final decision regarding
    whether to sustain the appeal. Policy JICK-R, Bullying and Cyberbullying Prevention –
    Administrative Procedure.

11. Jeffrey Shedd is the principal of Cape Elizabeth High School. Pursuant to the school's
    bullying policy, the principal or designee is tasked with investigating and claims of
    bullying and disciplining such claims when they are found to be substantiated. *Id.*

12. Nathan Carpenter is the vice principal of Cape Elizabeth High School. He has shared
    responsibility for investigating and disciplining bullying in the school.

## Jurisdiction and Venue

13. This actions seeks to vindicates rights guaranteed by the First and Fourteenth
    Amendments to the United States Constitution and is brought under 42 U.S.C. § 1983.
    This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331,
    1343, and 1988, as this action arises under the Constitution and laws of the United States.

The Court also has jurisdiction to grant declaratory relief and any further relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2201.

14.   This Court has personal jurisdiction over the Defendants because the school district CESD is a political subdivision of the State of Maine located entirely within this federal district, and Superintendent Wolfrom, Principal Shedd, and Vice Principal Carpenter are also located within this federal district.

15.   Venue in this district is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendants are located within this district, and a substantial part of the events or omissions giving rise to the claim occurred within this district.

**Facts**

16.     Sexual assault is pervasive, underreported, and carries lifelong consequences for

survivors of all genders. One in four girls and one in six boys will be sexually abused

before they turn 18 years old. Sexual Assault in the United States, NATIONAL SEXUAL

VIOLENCE RESOURCE CENTER, Get Statistics, https://www.nsvrc.org/node/4737.

17.     Victims of sexual assault frequently feel discouraged from reporting their assaults

because of a fear that they will not be believed, a fear that they will be blamed, or a fear

that the perpetrator will go unpunished. One in five women is sexually assaulted on

college campus, and more than 90% of them do not report their assault. *Id.*

18.     Laws against sexual assault are chronically under-investigated and under-enforced. Out

of every 1,000 allegations of sexual assault, 230 are reported to the police, 46 reports lead

to arrest, and 5 arrests lead to a felony conviction. In comparison, out of every 1,000

allegations of robbery, 619 are reported to the police, 167 reports lead to arrest, and 22

arrests will lead to a felony conviction. The Criminal Justice System: Statistics, RAINN,

https://www.rainn.org/statistics/criminal-justice-system.

19.     A.M. is an award-winning advocate for victims and survivors of sexual assault and is
        generally politically engaged. She is a high school student ambassador for SafeBAE, a
        national organization dedicated to addressing sexual violence in middle and high schools,
        and she is the Maine state director of March For Our Lives, a student-led anti-violence
        initiative. A.M. served as a moderator for a speech by Presidential candidate Pete
        Buttgeig, and she was a presenter at the HALT and Every Voice summit at Harvard
        Graduate School of Education. A.M. is also an eTAG Youth Advisory member for Break
        the Cycle, a national public education organization that creates resources for adults to
        support youth who have experienced sexual assault, domestic violence, dating violence,
        and cyberstalking.

20.     A.M. was nationally recognized for her activism by U.S. Cellular as one of "16 under 16"
        in 2019. She used the $10,000 from that award to help fund a student-led conference on
        sexual assault in schools, called Consent: The Way Life Should Be, which was attended
        by approximately 750 students. The conference included "know your rights"
        presentations on Title IX, as well as discussions of substance abuse, consent within
        relationships, and sexual assault on college campuses.

21.     Because of her activism and her public stance as an ally for victims and survivors of
        sexual violence, other young people frequently approach A.M. and share their personal
        stories of sexual assault with her. Some of those people are her fellow students at Cape
        Elizabeth High School.

22.     In those situations, A.M. urges students to find a trusted adult to speak with about their
        experiences, whether it is a parent, a teacher, a coach, or a therapist.

23.   Because of her deep involvement in anti-violence work, and because of these personal stories from survivors, A.M. is aware that alcohol and drugs are frequently involved in episodes of sexual violence.

24.   A.M. believes that students in the District are sometimes reluctant to speak to school officials about sexual violence, in part because they are afraid that school officials will punish them if they admit to using alcohol or drugs.

25.   On June 11, 2019, A.M. and two other CESD students raised their concerns about inadequate responses to sexual violence to the CESD school board. A.M. told the board that the district had no policy describing how to report sexual harassment and assault, and she asked that the board work with students on a comprehensive policy that would encourage reporting and support students who self-report sexual assaults.

26.   A.M. and the other students also raised concerns that victims are not informed about the outcomes of investigations, and they complained that some faculty members were not complying with the mandatory reporting requirements involving potential sexual assaults. They asked that the school district provide trauma-informed trainings to all staff covering the intersections of title IX and mandated reporting specific to the state of Maine.

27.   The school board never followed up with A.M. about working with her and the other students at the board meeting to improve school policies.

28.   On September 16, 2019, A.M. decided to take her activism in a new direction, in part due to her frustration with the lack of response to her overtures to the school made through official channels of communication.

29.    A.M. wrote on a post-it note, "There's a rapist in our school and you know who it is." She placed this note, a modern-day leaflet, in the second floor girl's bathroom at CEHS and took a picture of herself standing in front of it.

30.    A.M. did not direct the note at any person; the "you" in the note referred to the school administration that was insufficiently attentive to the needs of survivors of sexual violence.

31.    A.M. did not intend the note to only refer to one person, and she believed (and continues to believe) that there are a number of people who have committed various forms of rape in the CEHS community, all of whom were described by the note.

32.    Anti-violence activists like A.M. tend to define the terms "rape" and "rapist" broadly, as including a broad range of acts participating in, or contributing to, nonconsensual sexual activity. "Rape" does not have a legal definition in Maine law, which instead uses the term "gross sexual assault."

33.    Within minutes of A.M. placing her post-it in the bathroom, another student entered the bathroom, removed the note, and took it to the administration.

34.    Other people placed additional notes in the bathroom, but they were also removed.

35.    A.M. showed her picture of herself with the note to other classmates.

36.    Upon receiving the notes from the other students, the school administration treated them as a complaint under Title IX of the Education Amendments Act of 1972 (codified at 20 U.S.C. §1681). The school administration subsequently conducted an investigation of the allegation of sexual violence in the school, as is required by law and by the school's own Title IX procedures.

37.     CEHS administrators were familiar with these procedures because the school had received at least 10 complaints under Title IX (not including A.M.'s complaint) in the previous year. Of these, five complaints were substantiated.

38.     Even when claims of sexual harassment and assault are substantiated, the school does not share with victims or survivors the discipline imposed on the perpetrator, claiming that federal law mandates confidentiality in such cases. Even assuming it is required by law, such confidentiality contributes to an impression in the school that perpetrators are not disciplined for acts of harassment and assault.

39.     Later on September 16, additional notes were posted in the first floor girls' bathroom. A.M. did not communicate or coordinate with the students who posted these "copycat" notes.

40.     Later the same day, Vice Principal Carpenter brought A.M. in for questioning with the school resource officer and showed her a note. A.M. did not disclose at the time that she had posted one of the notes in the second floor bathroom because she feared repercussions.

41.     Vice Principal Carpenter questioned other students throughout the day, including some of A.M.'s friends. Vice Principal Carpenter told the students that the students responsible for the notes would not be punished.

42.     After other students learned of the notes, A.M. was told about additional concerns of sexual violence that she had not known about prior to posting her note. One incident she heard about involved students from another school, while another incident reportedly involved students producing a video of a CEHS student being sexually assaulted while intoxicated.

43.     On September 17, 2019, A.M. was asked to meet with the CESD Superintendent, the
        CESD Title IX Coordinator, the CEHS principal, the CEHS vice principal, and the CEHS
        school resource officer.

44.     These administrators asked A.M. to disclose the names of victims of sexual violence who
        had confided in her.

45.     A.M. asked whether these students would be punished if they reported that they had been
        using drugs or alcohol when they were assaulted, and the school administrators refused to
        answer but instead asked whether A.M. thought that might be a barrier for students to
        report incidents of rape or harassment. A.M. responded in the affirmative.

46.     A.M. told the administrators that she would urge students who have experienced sexual
        violence to report those incidents to the proper authorities but that she would not disclose
        any confidences to the administrators without the permission of the victims.

47.     The administrators then asked A.M. to disclose the names of any perpetrators of sexual
        violence that she was aware of in the school. A.M. described two situations that had been
        described to her after she posted the notes. The administrators quickly rebuked A.M. for
        "spreading rumors" even though A.M. was responding to the administrators' inquiries.

48.     The administrators also informed A.M. that they were aware of the incidents she
        described and that they did not constitute rape.

49.     No effort was made in the conversation to make sure that all the participants were using
        an agreed-upon definition of "rape" or "rapist."

50.     On September 20, 2019, the CEHS principal sent an email to the entire school
        community about the post-it notes. Att. A. The principal stated, "The messages claim
        adults in the school knew [about the sexual violence] and implied that we would be

indifferent." The principal stated that, in response to A.M.'s leafleting, school administrators interviewed over 20 people and subsequently concluded that "our school is safe."

51.   The principal's email also stated that, "In the course of our investigation, however, we uncovered much misinformation some of which has been hurtful to a number of students and other people in our community."

52.   On September 24, the CESD and CEHS administrators again asked to meet with A.M.

53.   At this meeting, the principal told A.M. that his focus had shifted to "the note writing that started the entire problem."

54.   The principal told A.M. that the insinuation of the notes is "pretty clear even though it doesn't say that the administration isn't doing anything and 'you' aren't doing anything—'you' as 'the administration.' That was my inference absolutely. Not sure if that's what you intended."

55.   A.M. was asked to provide the names of other students who had placed post-it notes about rape in the second-floor women's bathroom on September 16. A.M. was told that the administrator's approach to the incident would be "to emphasize a learning response not a punitive response. . . . We don't have detentions in this building. It's about conversations and how do we move forward." A.M. refused to provide the names of any other students whom she suspected of writing the additional notes.

56.   In the days after September 16, a reporter from the Portland Press Herald reached out to A.M. about the incident involving the post-it notes, adding that Superintendent Wolfrom had also been contacted for a comment.

57.     On October 4, 2019, the Portland Press Herald published a story about the post-it notes that included criticisms of the CESD and CEHS administrations. While other students spoke on background or not-for-attribution to the reporters on the story, A.M. spoke on the record and expressed her concerns: "I don't feel like my school deals with the issue of sexual assault in a good way. . . . I feel there are a number of survivors in our school who have told me they have reported, whether through the guidance process or to other staff members, and no steps been taken to address those issues or steps have been taken where the response to those accusations hasn't been great." *See* Rachel Ohm, "Cape Elizabeth students fault school system's handling of sexual assault allegations," Portland Press Herald, October 4, 2019.

58.     In that story, the CESD superintendent and the CEHS principal state that the post-it notes are being looked into and there is not a rapist at CEHS.

59.     On October 4, 2019—the same day the Portland Press Herald story that was critical of the school and included quotes from A.M. was published—Principal Shedd and Vice Principal Carpenter notified A.M. that she was suspended for three days. *See* Att. B.

60.     A three-day suspension is a serious punishment. According to the CEHS principal, suspensions are rarely given at CEHS. Suspension is one type of discipline that is considered in college admissions. The Common Application for college admission asks students whether they have been suspended. A student may answer "no" to this question only if they have never been suspended or if their suspension has been expunged.

61.     In issuing the suspension, the principal of CEHS told A.M. that her post-it note created "a pattern of an intimidating educational environment."

62.     In a letter to A.M. and her parents, the CEHS principal and assistant principal stated that they have found that "the actions of students writing or posting notes in our school bathroom did in fact constitute an act of bullying within our policy. Specifically, it was part of a 'pattern of . . . expression . . . directed at a student. . .that [created] an intimidating educational environment . . . or [interfered] with the student's . . . ability to participate in or benefit from the services, activities, or privileges provided by the school." Att. B.

63.     Contrary to this letter, the note posted by A.M. in the bathroom was not directed at a student.

64.     Contrary to this letter, the note posted by A.M. in the bathroom was not part of a pattern of expression directed at a student.

65.     Contrary to this letter, the note posted by A.M. did not create an intimidating educational environment, nor did it interfere with a student's ability to participate in or benefit from the services, activities, or privileges provided by the school.

66.     The note posted by A.M. in the bathroom did generate an investigation into sexual violence by the CESD and CEHS administrations, and it did generate public attention to the problems of sexual violence and the belief on the part of victims that the administration is insufficiently committed to preventing sexual violence.

67.     The note posted by A.M. also drew unwelcome attention to the CEHS and CESD administrations, including an unflattering story in the local newspaper.

68.     The Cape Elizabeth School District anti-bullying policy (Policy JICK, "Bullying and Cyberbullying Prevention in Schools") states that, 'Bullying' has the same meaning in this policy as in Maine law.

69.    Maine law (20-A M.R.S. §6554(2)(B)) defines bullying as "a written, oral or electronic expression or a physical act or gesture or any combination thereof directed at a student or students that: 1) has, or a reasonable person would expect to have, the effect of: a) physically harming a student or damaging a student's property; or b) placing a student in reasonable fear of physical harm or damage to the person's property; 2) Interferes with the rights of a student by: a) creating an intimidating or hostile education environment for the student; or b) Interfering with the student's academic performance or ability to participate in or benefit from the services, activities or privileges provided by the school; or 3) Is based of a student's actual or perceived characteristics identified in Title 5, section 4602 or 4684-A [the Maine Human Rights Act and the Maine Civil Rights Act] or is based on a student's association with a person with one or more of these actual or perceived characteristics or any other distinguishing characteristics and that has the effect described in subparagraph 1 or 2."

70.    In other words, there are many ways that actions can constitute bullying, but all of these only apply to actions that are "directed at a student or students."

71.    After the suspension, many news outlets issued news updates about the school's decision to suspend a student for speaking out about sexual assault at school. The story prompted widespread concern that survivors, allies, and advocates would become even less likely to report or speak out about sexual assault for fear of being disciplined.

72.    As the story reached national prominence, A.M. issued a statement to again clarify her intentions in writing the notes and engaging in other advocacy at CEHS, stating in relevant part:

> As this story gets national attention, I feel an immense responsibility to clarify my intentions. I never set out to bully or name one specific

perpetrator in my school, when I posted notes in the bathrooms. There have been multiple investigations, multiple perpetrators, & multiple survivors in my school. Sadly, that is true of every single school, everywhere. These issues have been very important to me for many years now. All of my efforts to address the issues specific to my school have been because I care so much about all of the students in my school. I do not want to believe that anyone set out to intentionally harm anyone else, but I believe my school and most schools fail students in helping them to understand enthusiastic consent and how to navigate our first sexual experiences. This leaves every one of us vulnerable to learning about things from some of the worst resources. The consequences of this are devastating to EVERYONE involved. We must do better. I refuse to remain silent and allow another generation to be failed by adults. We cannot go back and undo the inexcusable actions of the past, but we can prevent future incidences from taking place. I want to come together, to do better and show the generation after us that this is where it ended.

73.    In emphasizing that she "refuse[d] to remain silent and allow another generation to be failed by adults," A.M. channeled a message that has become common for activists of her generation, whether advocating for gun control or climate change.

74.    After receiving notice of the suspension, A.M.'s mother announced that she would appeal the suspension and the school set the appeal date for October 9, 2019, before the CESD superintendent, who has the authority to reverse or alter the discipline imposed on a student, or to reopen the investigation.

75.    At the appeal, A.M. reiterated to Superintendent Wolfrom that her note was not directed at a single person, but rather referred to more than one person and was posted for the purpose of prompting a conversation about the school's handling of sexual assault complaints and school policies and practices that discouraged victims from reporting.

76.    On the same day that Superintendent Wolfram heard A.M.'s appeal, the superintendent and the school's Title IX coordinator appeared on a morning radio show to discuss the recent events. https://wgan.com/morningnews/cape-elizabeth-school-department/.  On

that radio show, the school officials reiterated that they had treated the notes as a Title IX report and investigated accordingly.

77. Also on October 9, 2019, Principal Shedd issued a public letter to parents, beginning with concerns that people from across the country were contacting school officials with critical or insulting messages. Att. C (stating "This has to stop"). Principal Shedd stated that the students who posted sticky notes "regret their choices, I'm sure" and would "learn" from the experience. He further stated that suspension is "a consequence we rarely assign."

78. After two days of consideration, Superintendent Wolfrom denied A.M.'s appeal in the afternoon of Friday, October 11, 2019, refusing to reconsider the discipline or to reopen the investigation. Att. D.

79. Superintendent Wolfrom ordered that the suspension take place starting on the next school day, Tuesday, October 15, through Thursday, October 17. Not only would this cause A.M. to miss three days of school, but she would miss the PSAT scheduled for Wednesday, October 16, 2019, and would have to request a "make-up" date to take that standardized test.

80. In her October 11, 2019 letter rejecting A.M.'s appeal, Superintendent Wolfrom stated that, even though A.M. denied that the post-it note was directed at any individual, that "the language of the notes [sic] you posted indicate that your speech was directed at a specific individual."

81. In fact, the language in A.M.'s note indicates the opposite. A.M.'s note said, "There's a rapist in our school, and you [a third party] know who it is." The plain meaning of the text of A.M.'s note is that it was directed at the person or people at Cape Elizabeth High

School who know about incidents of sexual violence but who have not adequately responded to the safety implications of that information.

82.    Additionally, school administrators admitted in meetings with A.M. that the notes prompted them to investigate four to eight rumors of potential sexual assault—and thus related to numerous individuals, not a single person.

83.    Administrators further admitted that they viewed the notes as criticizing the administration's response to sexual assault, confirming the plain meaning of the notes that they are directed at a third person rather than at any perpetrator of sexual violence.

84.    Superintendent Wolfram stated in her October 11 letter that, "the student you targeted was ostracized by his peers and was unable to come to school as a result."

85.    Contrary to Superintendent Wolfrom's claim, A.M. never "targeted" any specific student. The school district did not (and could not) find that A.M. named any perpetrator through the notes or through other conversations with students.

86.    The school treated A.M.'s sticky note as an anonymous Title IX report and investigated accordingly. At the outset of the investigation, school administrators followed up with multiple survivors whose complaints had resulted in substantiated Title IX findings, and with multiple different rumors of potential sexual misconduct. To the extent their investigation ever narrowed down to a single individual, that was the result of school administrators pursuing rumors from *other* students and other information in the possession of the administrators, separate and apart from anything A.M. said or did.

87.    A.M. was not aware of any allegations of sexual violence by that individual until after she posted her note in the bathroom and another student told her about it.

88.    A.M. is being suspended as punishment for core political speech that drew unwanted public attention to the CESD and its administrators.

89.    A.M. is being suspended for speech on one of the most pressing issues of our times—the prevalence of sexual violence and the danger of inaction by those in positions of power. That the school administration disagrees with A.M.'s conclusions or her advocacy strategies does not undercut the level of First Amendment protection available to A.M.

90.    By punishing A.M. for protected speech, Defendants are violating A.M.'s right to freedom of speech.

91.    CESD's policies prohibiting speech that is critical of school officials but that  is not directed at another student are vague and overbroad.

92.    CESD's punishment of A.M. for her report of sexual violence in CEHS amounts to retaliation in violation of federal statutory and constitutional law.

93.    CESD's actions are producing ongoing irreparable harm for which there is no adequate remedy at law.

<u>Claims</u>

**Count I: First Amendment to the United States Constitution**

**<u>Punishment for Posting a Leaflet and Speaking to the Press</u>**

94.   A.M. engaged in speech that is protected by the First Amendment: posting a leaflet and speaking to the press.

95.   A.M.'s speech was critical of Defendants, and it drew unwelcome public attention to Defendants' actions and inactions

96.   In response, Defendants used their official authority to punish A.M.

97.   A.M. was suspended from school, even though her speech did not cause a material and substantial disruption to the school day and did not otherwise fall into one of the narrow categories of student speech that can be regulated by the school, including language that is lewd and indecent.

98.   Defendants' suspension of Plaintiff for placing a post-it note about sexual violence, and their prior restraint against future similar forms of expression, violate the Plaintiff's right to free expression under the First Amendment to the U.S. Constitution, as applied to the states by the Fourteenth Amendment and 42 U.S.C. §1983

## Count II: Title IX

### Retaliation for Protected Activity

99.   A.M.'s anonymous post-it note about sexual violence in CEHS constituted a complaint under Title IX and it was treated as a complaint under Title IX by the Defendants and investigated accordingly.

100.   Following that investigation, Defendants suspended A.M. (as the complainant) for creating trouble for the Defendants with her complaint.

101.   Defendant's punishment of Plaintiff for making a complaint under Title IX amounts to unlawful retaliation in violation of the statute.

### PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests that this Court provide the following relief:

a)   Declare that Defendant's application of its anti-bullying statute to Plaintiff's protected expressive activity that was not directed at another student was unlawful;

b)   Declare that Defendant's disciplinary actions against Plaintiff for sticking a post-it note in a bathroom violates Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution;

c)   Declare that Defendant's disciplinary actions against Plaintiff for her core political speech that was critical of the Defendant and that drew unwelcome attention to the Defendant violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution;

d)   Declare that Defendant's disciplinary actions against Plaintiff in response to her complaint of sexual violence in CEHS constituted unlawful retaliation against a Title IX complainant in violation of 20 U.S.C. §1681;

e) Enjoin the Defendant from any continuing punishment or sanction against Plaintiff on account of her constitutionally protected speech, including:

    i.    Rescinding the three-day suspension imposed against Plaintiff;

    ii.   Expunging from Plaintiff's school records all references to the incident in question and the suspension resulting from it;

f) Enjoin the Defendant from punishing A.M. from engaging in "future actions of this sort" that are not directed at any student;

g) Award Plaintiff's costs and attorney's fees pursuant to 42 U.S.C. §1988; and

h) Grant such other relief as this Court deems just and proper.


October 13, 2019                  Respectfully Submitted,

                                     s/ Emma E. Bond
                                     Emma E. Bond.
                                     /s/ Zachary L. Heiden
                                     Zachary L. Heiden
                                     American Civil Liberties Union of Maine Foundation
                                     121 Middle Street, Suite 200
                                     Portland, ME 04103
                                     (207) 619-8687
                                     ebond@aclumaine.org
                                     (207) 619-6224
                                     heiden@aclumaine.org

                                     Counsel for Plaintiff

## **VERIFICATION**

I, Shael Norris, hereby affirm under the penalties of perjury as follows:

1.  I am over the age of 18 and otherwise competent to testify.

2.  The factual allegations in the foregoing Verified Complaint are, to the best of my

    knowledge and believe, true and accurate.


Dated: October 13, 2019                                      _____
                                                             Shael Norris


I, A.M., am the daughter of Shael Norris and the minor Plaintiff identified in this action. I

hereby affirm under the penalties of perjury that the factual allegations in the foregoing

Verified Complaint are, to the best of my knowledge and belief, true and accurate.


Dated: October 13, 2019                                      AM
                                                             _____
                                                             A.M. (a minor)