# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

A.M., a minor, by and through her mother,  )
SHAEL NORRIS                               )
                                           )
               Plaintiff                   )
                                           )
v.                                         )
                                           )   Case No. 2:19-cv-00466-LEW
                                           )
CAPE ELIZABETH SCHOOL DISTRICT, et al.     )
                                           )
                                           )
               Defendants                  )


# MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER OF DEFENDANTS CAPE ELIZABETH SCHOOL DEPARTMENT, DONNA WOLFROM, JEFFREY SHEDD AND NATHAN CARPENTER

## INTRODUCTION

Plaintiff Shael Norris has filed this suit on behalf of her daughter, A.M., a 15-year-old student at Cape Elizabeth High School, claiming that the Defendants, the Cape Elizabeth School Department[1] (the "School Department") and three individual administrators, Donna Wolfrom, Jeffrey Shedd and Nathan Carpenter, violated A.M.'s right to free speech when they disciplined her for posting and disseminating the following statement in school: "THERE'S A RAPIST IN OUR SCHOOL, AND YOU KNOW WHO IT IS."  The statement was unfounded; extremely disruptive and defamatory; and violated the rights of the student she falsely accused.  It is

---

[1] Plaintiff's Complaint names the Cape Elizabeth School District as the Defendant.  The entity, a municipal school administration unit, operates under the name is Cape Elizabeth School Department.

therefore not protected speech under the First Amendment and Plaintiff's motion for a temporary restraining order must be denied.

## FACTUAL BACKGROUND

**1.  The sexual violence allegation and investigation**

On September 16, 2019, several sticky notes stating "THERE'S A RAPIST IN OUR SCHOOL, AND YOU KNOW WHO IT IS" were discovered in a second floor girls' bathrooms at Cape Elizabeth High School ("CEHS").  Shedd Decl. ¶ 7; Carpenter Decl. ¶ 5.  Within minutes after the notes were  posted, a concerned student brought them to the main office. Carpenter Decl. ¶ 5.  Approximately two hours later, several more notes referring to a rapist in the school were posted in a different girls' bathroom on the first floor of the school, and those notes were also reported to school administration.  Shedd Decl. ¶ 8; Carpenter Decl. ¶ 10.

Upon review of the notes, school administrators understood them to constitute an accusation of rape against a specific individual.  *See* Wolfrom Decl. ¶ 2; Stankard Decl. ¶ 9; Shedd Decl. ¶ 9; Carpenter Decl. ¶ 6.  Although the administrators did not at that point know the identity of the individual, they believed that the author of the notes did know the identity of the individual they were targeting as a "rapist."  Concerned about the safety of students in the school, the administrators immediately began a thorough investigation to determine who posted the notes, the identity of the alleged rapist and the factual basis for the accusation.  Shedd Decl. ¶ 10; Carpenter Decl. ¶¶ 7-9, 11; Stankard Decl. ¶ 7; Wolfrom Decl. ¶ 2.

Administrators interviewed dozens of students and very quickly learned that a number of students interpreted the accusation as referring to a specific individual, an African-American male student at the school ("Student 1").  Shedd Decl. ¶ 12; Stankard Decl. ¶ 12.  One of the students interviewed was Plaintiff A.M.  Carpenter Decl. ¶¶ 8.  In that interview, A.M. denied

knowing anything about the notes, but did state that she had heard rumors that there was a rapist in the school.  Shedd Decl. ¶ 13; Carpenter Decl. ¶¶ 8.

Administrators heard from other students who were interviewed that Student 1 was rumored to have committed several sexual assaults.  Shedd Decl. ¶ 14; Carpenter Decl. ¶ 12; Stankard Decl. ¶ 12.  Administrators were aware of one incident that occurred between Student 1 and another student outside of school the previous year that had been dealt with to the satisfaction of both parties.  *See* Carpenter Decl. ¶¶ 4, 7.  In the interviews, however, they heard several other accusations against Student 1 and they meticulously followed every lead they received, Stankard Decl. ¶ 11; Carpenter Decl. ¶ 15.  After speaking directly to an alleged victim, reviewing video tapes and interviewing students, the administrators determined that the accusations were false. *See* Shedd Decl. Ex. 3 at p.2.  To the extent it could be established by this very thorough investigation, the administration determined that here was no known rapist in the school; there was no known ongoing threat to students of sexual violence; the school was safe. *Id.*

### 2.  The bullying investigation

As administrators were completing their investigation, they became aware that Student 1 was suffering the consequences of the false allegations.  Shedd Decl. ¶¶ 16-20; Carpenter Decl. ¶¶ 20-21.  Specifically, because of the widespread rumors sparked by the sticky notes accusing Student 1 of being a rapist, he was being ostracized by his peers and was afraid to come to school.  Shedd Decl. ¶¶ 17-19.  Student 1 and his parents complained that he was being bullied. Shedd Decl. ¶ 20; Carpenter Decl. ¶ 21.  School administration thus began a separate investigation into Student 1's bullying complaint under the School Board Bullying Policy) JICK and JICK-R.)  Shedd Decl. ¶¶ 21-22; Carpenter Decl. ¶ 21.

In conducting the bullying investigation, the administrators were of course aware that Student 1 is African American, and Student 1 and his mother expressed concerns that he was being targeted because of his race.  Carpenter Decl. ¶ 22.  A.M. herself, in discussions with other students, contended that the school was giving A.M. favorable treatment because of his race. Shedd Decl. ¶ 14; Carpenter Decl. ¶ 13.  The bullying statute and school policy define bullying to include expression or conduct that is based on a student's race.  20-A M.R.S. § 6554(B)(3); Shedd Decl. ¶ 3, Exhibit 1.  While racially-motivated bullying is clearly illegal, proof of such a motive is not necessary to a determination that bullying has occurred.  *Id.*  Whether motivated by race or some other factor, behavior that interferes with the rights of a student by creating a hostile educational environment or interferes with the student's academic performance or ability to participate in school is illegal.  20-A M.R.S. § 6554(B).  While Student 1 and his parents did not characterize their complaint as one of racial discrimination, the circumstances, including A.M.'s references to his race, could support an inference of race-motivated bullying and also evoke extremely egregious racial stereotypes.

The bullying investigation included consideration of material obtained in interviews in the investigation into whether there was a rapist in the school, as well as review of video surveillance tapes to try to determine who was responsible for posting the notes.  *See* Shedd Decl. Ex. 3.  The administration determined who posted the notes in the first floor bathroom as the two students who did so admitted what they had done and explained that they had posted the notes in response to the notes that had been posted earlier in the second floor bathroom.  *See* Shedd. Decl. ¶ 27; Carpenter Decl. ¶ 26.

With respect to the notes posted in the second floor bathroom – the first notes that were posted – several students reported to the administration that A.M. had told them that Student 1

was a rapist, and several others reported that A.M. had been discussing the notes and had even displayed pictures of herself with the notes. Shedd Decl. ¶ 14; Carpenter Decl. ¶¶ 11-13, 15. Students also reported that A.M. had expressed frustration because she felt that administration was protecting Student 1 because of his race. Shedd Decl. ¶ 14; Carpenter Decl. ¶ 13. Review of video footage of the entrance to the second floor bathroom showed that A.M. was the only person to enter the bathroom between the time when students who used that bathroom reported not seeing notes and the time when they were found. Carpenter Decl. ¶ 14.

Having learned this additional information, administrators interviewed A.M again. Carpenter Decl. ¶ 14; Wolfrom Decl. ¶¶ 4-6; Stankard Decl. ¶ 12. In the second interview, she falsely denied knowing anything about the notes as she had in her first interview. Carpenter Decl. ¶ 14. After being informed that the school had video footage and statements from other students, A.M. admitted that she had posted a note. *Id.* She disclosed that the person she identified in the note as a "rapist" was Student 1. Stankard Decl. ¶ 15. She also expressed frustration because she perceived that Student 1 was "idolized" by faculty at the school, in part because of his race, even though she believed that there was a video of him committing a horrendous act of sexual violence. Carpenter Decl. ¶ 14; Stankard Decl. ¶ 15. Finally, she said the reason she posted the note was to "instill fear." Carpenter Decl. ¶ 14; Stankard Decl. ¶ 17. Administrators learned that in addition to posting the note in the bathroom, A.M. had taken and disseminated a photo of the note[2]:

---

[2] This is a copy of a photo posted online that was apparently furnished to the media by A.M.



Having determined who posted the notes in both bathrooms, and that the notes were intended to refer to Student 1, CEHS Principal Jeffrey Shedd and Assistant Principal Nate Carpenter met on Thursday, September 26, 2019 to discuss what, if any, discipline should be imposed on the three students who ultimately admitted to posting the notes in the two bathrooms. Shedd Decl. ¶¶ 28-29; Carpenter Decl. ¶¶23-24.  They were very concerned that the spreading of the false allegations against Student 1 had significantly interfered with his right to attend, fully participate in and benefit from school.  Shedd Decl. ¶ 34.  Principal Shedd and Assistant Principal Carpenter agreed that the three students who posted the sticky notes and targeted Student 1 should be suspended, and that they should also attend an educational session on responsibly reporting suspected school violence.  Carpenter Decl. ¶ 24.That day, they discussed suspending A.M. for five days, one of the other students who posted the copycat notes for two days, and the other student who posted the copycat notes for one day.  Shedd Decl. ¶ 24.

On Monday, September 30, 2019, Principal Shedd told Assistant Principal Carpenter and Superintendent Donna Wolfrom that over the weekend he had thought more about the suspensions and decided that a three-day suspension was appropriate for A.M., and the two day and one day suspensions were appropriate for the other students.  Shedd Decl. ¶¶ 29-30. The varying lengths of the suspensions reflected each student's level of involvement in posting the notes and targeting Student 1.  Carpenter Decl. ¶ 26; Shedd Decl. ¶29.

School Board procedure JICK-R requires that if bullying has been substantiated, the building Principal will provide written notification to:  "A. The parents/guardians of the targeted student, including the measures being taken to ensure the student's safety; and B.  The parents/guardians of the student found to have engaged in bullying, including the process for appeal."  Upon making his decision as to the appropriate discipline for the three girls found to have engaged in bullying behavior, Principal Shedd started trying to contact Student 1's parents to meet with them and discuss the results of the investigation. Shedd Decl. ¶ 31.  After attempting to reach them by telephone on October 1, 2019, he sent them an email on October 3, 2019 to communicate the results of the bullying investigation.  Shedd Decl. ¶ 31 and Ex. 4.  The next day, October 4, 2019, Principal Shedd and Assistant Principal Carpenter met with the three girls about their suspensions.  Shedd Decl. Shedd Decl. ¶ 31 33; Carpenter Decl. Shedd Decl. ¶ 3128.  They met with the two other girls in the morning, and with A.M. and her mother in the afternoon.  The meeting with the girls took place after an article about A.M. appeared in the press; however, the decision to suspend A.M. had been made on Thursday, September 26, 2019, and the length of her suspension had been finalized on Monday, September 30, 2019, well in advance of the publication of the article.  Carpenter Decl. ¶ ¶ 24 – 28; Shedd Decl. ¶ 29-30; 32, 35.

7

## ARGUMENT

## I.   THE STANDARD FOR INJUNCTIVE RELIEF

This Court analyzes a request for a temporary restraining order and a preliminary injunction through application of four well-established factors:

> (1) the likelihood of the movant's success on the merits; (2) the anticipated incidence of irreparable harm if the injunction is denied; (3) the balance of relevant equities (*i.e.*, the hardship that will befall the nonmovant if the injunction issues contrasted with the hardship that will befall the movant if the injunction does not issue); and (4) the impact, if any, of the court's action on the public interest.

*L.L. Bean, Inc. v. Bank of America,* 630 F. Supp. 2d 83, 86 (D. Me. 2009) (citing *Borinquen Biscuit Corp. v. M V Trading Corp.,* 443 F.3d 112, 115 (1st Cir.2006)).

The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor. *Id.* (citing *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006)); *Baldwin v. Bader*, No. 07-46-P-H, 2008 WL 564642, at *1 (D. Me. Feb. 28, 2008)). "This burden is a heavy one: 'Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.'" *Id.* (citing *Friends of Magurrewock, Inc. v. U.S. Army Corps of Engineers*, 498 F.Supp.2d 365, 369 (D. Me. 2007) (quoting *Greater Yellowstone Coal. v. Flowers,* 321 F.3d 1250, 1256 (10th Cir.2003)). *See also Baldwin,* 2008 WL 564642, at *1 ("The court must 'bear constantly in mind that an [i]njunction is an equitable remedy which should not be lightly indulged in, but used sparingly and only in a clear and plain case.'") (quoting *Saco Def Sys. Div. Maremont Corp. v. Weinberger,* 606 F. Supp. 446, 450 (D. Me. l985)).

This Court has further explained that "[t]he sine qua non of the four part test is likelihood of success on the merits: if the moving party cannot demonstrate that it is likely to succeed in its quest, the remaining factors become matters of idle curiosity." *L.L. Bean, Inc.*, 630 F. Supp. 2d

at 86 (citing *Esso Standard Oil Co. (Puerto Rico),* 445 F.3d at 18 (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.,* 287 F.3d 1, 9 (1st Cir. 2002)). *See also McGuire v. Reilly,* 260 F.3d 36, 42 (1st Cir. 200l) (stating that movant must show "a substantial likelihood of success on the merits").  For the reasons set forth below, Plaintiff cannot satisfy the above standard in the present case.

## II.   PLAINTIFF CANNOT SUCCEED ON THE MERITS OF HER FIRST AMENDMENT CLAIMS

Count I of the Complaint is a claim for violation of A.M.'s First Amendment rights. Plaintiff makes two separate arguments: (1) that the statement for which she was suspended— "THERE'S A RAPIST IN OUR SCHOOL, AND YOU KNOW WHO IT IS"—is protected speech, and (2) that the suspension was retaliation for her subsequent comments to the press. These arguments are discussed separately below.

### A.  The sticky note is not protected by the First Amendment.

In order to prevail on a First Amendment retaliation claim, "[a] plaintiff must first prove that (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action."  *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012).

Students have First Amendment free speech rights in school, but:

[T]he First Amendment rights of students in the public schools "are not automatically coextensive with the rights of adults in other settings," *Bethel School District No. 403 v. Fraser,* 478 U. S. 675, 682 (1986), and must be "applied in light of the special characteristics of the school environment." *Tinker, supra,* at 393 U. S. 506; *cf. New Jersey v. T.L.O.,* 469 U. S. 325, 341-343 (1985).  A school need not tolerate student speech that is inconsistent with its "basic educational mission," *Fraser, supra,* at 478 U. S. 685, even though the government could not censor similar speech outside the school.

9

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988). Thus the Supreme Court and lower courts have identified a number of circumstances in which student speech in school is not protected by the First Amendment. For purposes of this case, the relevant limitations on student speech rights include:

- Speech that is likely to disrupt the school environment. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509-510, 514 (assessing whether disruption was reasonably forecast).

- Speech that does in fact disrupt the school environment. *Id.* at 513.

- Speech that is defamatory. *See, e.g.*, *Time, Inc. v. Firestone*, 424 U.S. 448, 457 (1976) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974)) (explaining that inaccurate and defamatory reports of fact do not deserve First Amendment protection).

- Speech that interferes with the rights of other students. *Tinker*, 393 U.S. at 513.

Each of these limitations on student speech rights applies to A.M.'s dissemination of unfounded accusations of rape against another student and, therefore, the behavior was not protected by the First Amendment.

1. **The Statement was inherently disruptive due to its extremely alarming nature.**

*Tinker* and numerous cases following *Tinker* have held that student speech is not protected if school officials reasonably forecast that it is likely to cause substantial disruption or material interference with school activities. *Tinker*, 392 U.S. at 509-510, 514.

In this case, the statement itself, even without the substantial disruption that did in fact occur, was incendiary and was inherently likely to disrupt the school environment. Like a bomb threat or a false fire alarm, the assertion that a known rapist is walking the halls of the school building is inherently alarming and very likely to cause disruption by instilling fear and anxiety

10

among students, staff and others in the school community.  *See, e.g.*, *Boim v. Fulton Cty. Sch. Dist.*, 494 F.3d 978, 983 (11th Cir. 2007) (holding that ten-day suspension of student who made threats of violence directed at her teacher in a notebook that she shared with a classmate was justified under *Tinker* as the threats were reasonably likely to cause a material and substantial disruption to the school); *Cuff ex rel. B.C. v. Valley Cent. School Dist.*, 677 F.3d 109, 111, 123 (holding disruption was reasonably forecast when student turned in an assignment stating "blow up the school with the teachers in it" even though student did not have capacity to carry out the threat and argued that the statement was a joke).

To avoid this conclusion, Plaintiff asks the Court to disregard the plain meaning of her statement and to consider what she now claims were her motives and intent in disseminating it. Her explanations and defense of her statement shifted from outright (false) denials that she made the statement, Carpenter Dec. ¶¶ 8, 14, to an admission that she intended to instill fear in the school, Carpender Decl. ¶14, Stankard Decl. ¶ 17, and finally to a tortured attempt by her counsel to characterize the false accusation as a form of political advocacy.  A.M. has no credibility because she lied outright to administrators in two separate interviews when asked about her role.  This obstructed the administration in their investigations into the alleged presence in school of a sexual offender and the bullying of Student 1.  Whatever explanation we choose to believe, however, they are all immaterial because what matters for purposes of deciding whether the speech is protected is the plain meaning of the statement as understood by others who read it or heard it.

The U.S. Supreme Court has made it absolutely clear that the school's reasonable interpretation of a statement – not the motive or intent of the speaker – is what determines whether the speech is protected by the First Amendment.  In *Morse v. Frederick,* the Court

decided that a student's banner proclaiming "BONG HiTS 4 JESUS," was not protected speech because the principal reasonably interpreted it as a pro-drug message, even though the student claimed it "was just nonsense meant to attract television cameras."  551 U.S. at 401.  The Court explained: "The dissent mentions Frederick's 'credible and uncontradicted explanation for the message—he just wanted to get on television.' <u>But that is a description of Frederick's *motive* for displaying the banner; it is not an interpretation of what the banner says.</u>"  *Id.* at 402 (emphasis added) (internal citations omitted).  "[W]hat matters under *Tinker* is the reasonableness of the school administrators' forecast of disruption—not the student's subjective intent behind the speech."  *R.L. v. Cent. York Sch. Dist.,* 183 F. Supp. 3d 625, 635–36 (M.D. Pa. 2016)

In this case, unlike in *Morse*, the Court need not struggle with the meaning of the student's unambiguous statement: "There's a rapist in our school, and you know who it is."  The first clause is a plain statement (allegation) of fact: there is a person who has committed rape[3] present in the school.  The statement as a whole directly implies that the speaker knows who the alleged rapist is, and the second clause directly implies that others know the identity of the alleged rapist.  A reasonable reader of this statement would interpret it to mean that a person whose identity is known to the speaker and others has committed rape and is present in school.  A reasonable student or teacher reading or hearing the statement would be very alarmed and upset by it.  A reasonable administrator would be justified in forecasting that such a statement was likely to disrupt the school community.  For that reason alone, the statement is not protected speech.

---

[3] The Plaintiff attempts to argue that "rape" does not have its plain meaning but instead should be interpreted to mean "a broad range of acts participating in, or contributing to, nonconsensual sexual activity." Complaint ¶ 31. Plaintiff is trying to defend her false and defamatory statement by reference to a political usage of the term by some activists.  While that notion may be gaining currency in some circles, the dictionary, and still prevailing, definition of rape is an assailant's nonconsensual penetration of the vagina or anus.
https://www.justice.gov/archives/opa/blog/updated-definition-rape

2. __The statement was in fact disruptive__

*Tinker* and dozens of lower court decisions have repeatedly held that speech that is disruptive to the school environment is not protected.  *See, e.g.*, *Tinker*, 392 U.S. at 513; *Riseman v. Sch. Comm. of City of Quincy*, 439 F.2d 148, 149 (1st Cir. 1971) ("We recognize the duty of school authorities to punish student conduct which 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others'"); *DeFabio v. E. Hampton Union Free Sch. Dist.*, 623 F.3d 71, 78 (2d Cir. 2010) (explaining that student "speech may be restricted if the speech will 'materially and substantially disrupt the work and discipline of the school.'")

In this case, Plaintiff's decision to post a sticky note in the second floor girls' bathroom unequivocally stating that "There's is a rapist in the school" instilled fear and anxiety in administrators and students.  Carpenter Decl. ¶ 19.  Within minutes of the notes being posted, a very worried and concerned student brought the notes to Assistant Principal Carpenter, who in turn was concerned about whether anyone in the school was in danger and whether there was in fact a rapist roaming the halls of the school building.  Carpenter Decl. ¶¶ 5- 6.  He immediately started talking with students to find out if they were in danger or if they knew anything about a rapist being in the school.  Carpenter Decl. ¶ ¶ 7-9.Without having any information other than "There is a rapist in the school" and "you know who it is," the administration conducted a thorough investigation, which included interviewing 47 students; reviewing video footage of the hallways; and reviewing video footage, in order to determine whether anyone was in danger and whether there was in fact a rapist in school.  The dissemination of the of the statement interrupted the work of administrators for multiple hours over many days, interrupted the school routines of the 47 students interviewed and spread fear in  the student body.  Indeed, a number of

students expressed genuine concern about whether the school was safe in light of the sticky notes.   Carpenter Decl. ¶ 19.

Furthermore, by targeting Student 1 with her sticky note, A.M. caused Student 1 to be ostracized by his peers and made him feel unsafe going to school.  Shedd Decl. ¶¶ 16 – 19; Carpenter Decl. ¶¶ 2- 21.On Tuesday, September 17, 2019, the day after the notes were posted, Student 1 went to the chorus room to eat his lunch as he ordinarily did.  Shedd Decl. ¶ 17. Within one minute of sitting down to eat his lunch, all of the other students in the chorus room left.  Student 1 also reported that while in chorus class that same afternoon, a classmate told him that her mother had heard from other mothers that they did not want their daughters associating with him.  Later that day, another classmate of Student 1 told him that he did not have a future and would not be able to get into college.  Shedd Decl. ¶ 19.  Thereafter, Student 1 missed eight days of school.  Shedd Dec. ¶ 39.

All of the consequences of A.M.'s dissemination of the statements amounted to substantial disruption of the educational environment for her peers, teachers, and administrators, as well as the target of her reckless accusations.  Because her statement set the disruption in motion it is not protected speech under *Tinker*.

### 3.  __The statement was defamatory.__

It is well-established that defamatory speech is not protected by the First Amendment. *Time, Inc. v. Firestone*, 424 U.S. 448, 457 (1976) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974)) (explaining that inaccurate and defamatory reports of facts do not deserve First Amendment protection).  *See also*, *Pan Am Sys., Inc. v. Atl. Ne. Rails & Ports, Inc.*, 804 F.3d 59, 65 (1st Cir. 2015) (citing *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19 (1990)) (noting that "[b]ecause they express the speaker's subjective views (rather than implying that he possesses

objectively testable facts), they are First–Amendment protected—not so, obviously, if they imply 'false assertion[s] of fact.'").

While there is relatively little case law addressing defamatory speech by students in school, one case (cited by Plaintiff) illustrates that malicious, defamatory statements by one student about another are unprotected.  In *Kowalski v. Berkeley County Schools,* 652 F.3d 565 (4th Cir. 2001)*,* the student plaintiff had created a web page falsely claiming that another student had genital herpes and was a "slut" and a "whore."  The Court ruled that these "defamatory accusations" were not protected speech, explaining:

> Given the targeted, defamatory nature of Kowalski's speech, aimed at a fellow classmate, it created "actual or nascent" substantial disorder and disruption in the school. *See Tinker,* 393 U.S. at 508, 513, 89 S.Ct. 733; *Sypniewski v. Warren Hills Reg'l Bd. of Educ.,* 307 F.3d 243, 257 (3d Cir.2002) (indicating that administrators may regulate student speech any time they have a "particular and concrete basis" for forecasting future substantial disruption). First, the creation of the "S.A.S.H." group forced Shay N. to miss school in order to avoid further abuse. Moreover, had the school not intervened, the potential for continuing and more serious harassment of Shay N. as well as other students was real. Experience suggests that unpunished misbehavior can have a snowballing effect, in some cases resulting in "copycat" efforts by other students or in retaliation for the initial harassment.

*Kowalski v. Berkeley Cty. Sch.*, 652 F.3d 565, 574 (4th Cir. 2011). Calling Student 1 a "rapist" with no factual basis no less damaging, and no less harmful, than the false allegations that the student in *Kowalski* had a sexually transmitted disease and was a slut and a whore.  As such, it is not protected by the First Amendment.[4]  Plaintiff's after-the-fact justifications are immaterial to the legal issue.

---

[4] See also, *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 131 (1st Cir. 1997) (explaining that the "court must evaluate a speaker's statement as it was given and must resist the temptation to replace what was actually said with some more innocuous alternative.").

**4.** **The note is unprotected because it interfered with the rights of another student.**

The Supreme Court identified a separate category of unprotected speech in *Tinke*r: that which collides with or interferes with the rights of other students. *Tinker* at 512-13, 514. The Ninth Circuit relied on this language when it held in *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1178 (9th Cir. 2006), *cert. granted, judgment vacated sub nom. Harper ex rel. Harper v. Poway Unified Sch. Dist.*, 549 U.S. 1262 (2007),[5] that anti-gay slurs were not protected speech because they did in fact interfere with the rights of gay and lesbian students.

A.M.'s unfounded statement interfered with Student 1's reputational rights, as explained above, and his right not to be bullied in school. Here, the school found that Plaintiff's dissemination of the allegation that Student 1 was a rapist constituted bullying in violation of school policy and the law. Schools not only have an affirmative legal obligation to keep students safe from sexual harassment and violence (A.M.'s concern), but also to keep them safe from bullying. 20-A M.R.S. § 6554.[6] The school has a compelling interest in preventing, remedying and protecting students from bullying, and the school's suspension of A.M. was necessary to further that interest.

To defend her behavior, A.M. goes to great lengths in her memorandum to argue that her conduct was not bullying. She notes that the definition of bullying in state law refers to conduct "directed at a student or students," and argues that her conduct was not bullying because her statement was not "directed at a student or students." The administration convincingly found, however, that the statement was in fact directed at Student 1, and that he was the victim of her

---

[5] Although the decision was vacated by the Supreme Court on the ground of mootness, its legal reasoning was not questioned and remains compelling and persuasive.
[6] The fact that in the predominantly white community of Cape Elizabeth, the alleged victim was an African American boy who was being accused of raping white girls, made this a particularly sensitive situation for the District.

bullying. She also claims that bullying must be "severe and pervasive" to constitute bullying, and that her posting of the unfounded accusation on a single day was not "severe and pervasive."[7]   There is no requirement, however, in state law or board policy that a bully's conduct be "severe and pervasive" in order to constitute bullying. A single, severe act, such as a baseless allegation of rape, is sufficient to constitute bullying just as, analogously, a single act of sexual assault is sufficient to constitute sexual harassment.

Plaintiff's argument egregiously minimizes the trauma she caused to Student 1. There is no question here that Student 1 was recklessly accused of serious criminal conduct by A.M.,[8] that he was ostracized; and that he was unable to go to school as a result of A.M.'s accusation that "there is a rapist in our school and you know who it is." The one person who was seriously harmed in this matter was Student 1. Any harm felt by A.M. was self-inflicted and resulted from her reckless, misguided behavior, and it is unfortunate  that she and her advocates so callously dismiss the collateral damage her conduct has caused.

### B. A.M.'s statements to the media were not the reason for the suspension.

A.M. also claims that the Defendants retaliated against her for speaking to the media as reported in an article published in the *Portland Press Herald* on October 4, 2019. Whether or not her statements to the media would be protected speech, this claim fails to satisfy the third element of a First Amendment retaliation claim, which "necessitates proof of a causal connection between the allegedly protected speech and the allegedly retaliatory response." *Gonzalez-Droz v.*

---

[7] The Maine Human Rights Commission's view on the definition of bullying has no persuasive authority in this case.  In the first place, to the extent the Maine Human Rights Commission is involved in bullying cases at all, those cases address that part of the definition pertaining to protected status found in 20-A M.R.S. § 6554(2)(B)(3),  not the section pertaining to creation of a hostile environment found in § 655(2)(B)(2).   In any case, the question here is how the term bullying is defined under Cape Elizabeth School Board policy, which is not an issue within the purview of the Maine Human Rights Commission.
[8] A.M. told administrators that Student 1 was depicted doing horrendous acts in a video even though that was not true and she had never seen the video.

*Gonzalez-Colon*, 660 F.3d 1, 16 (1st Cir. 2011). Here, there can be no causal connection because the decision to suspend A.M. was made before the *Press Herald* article was published on October 4th.

In *Gonzalez-Droz*, the plaintiff argued that the licensing board's decision to suspend his medical license occurred after he engaged in two instances of protected speech and that the temporal proximity between these two events supported a causal connection. *Id.* However, the factual record showed that the licensing board made its decision to suspend the plaintiff's license on December 12, 2006, before he engaged in his first instance of protected speech on December 18, 2006. *Id.* The Court held that because the licensing board's decision occurred before the plaintiff engaged in his first instance of protected speech, the suspension could not plausibly be viewed as retaliation. *Id.*

Likewise, in this case, Principal Shedd decided to suspend A.M. days before the October 4, 219 *Press Herald* article. Mr. Shedd and his fellow administrators concluded the bullying investigation on September 26, 2019 and made a decision to suspend all three students who had posted sticky notes. Shedd Declaration, ¶ 28. He informed the Superintendent and Assistant Principal of his final decisions on the suspensions on September 30, 2019. *Id.*, ¶ 30. He did not immediately inform the students of the suspensions because he wished to inform Student 1 and his family of the result of the investigations first, which he did on October 3, 2019 – before the *Press Herald* article was published. *Id.*, ¶ 31. He drafted the suspension letters, according to his computer, by 9:47 am on October 3, 2019. *Id.*, ¶ 32. In sum, the Principal had decided on the suspension before A.M. spoke to the media, and therefore his decision was not and could not have been motivated by her doing so.

18

Apart from the fact that the Principal was not aware of A.M.'s statements to the media when he made the decision, he and the administration have been consistent and explicit in stating that the reason for the suspension was A.M.'s false statement that "there's a rapist in our school and you know who it is."  Plaintiff has produced no evidence or credible allegation that her statements to the media were the reason for the suspension.  Therefore, her claim that the Defendants retaliated against her for speaking to the media fails.

## III.    THE DEFENDANTS DID NOT RETALIATE AGAINST A.M. FOR MAKING A TITLE IX COMPLAINT

In Count II of the Complaint, Plaintiff asserts a claim for Title IX retaliation.  Title IX is a federal spending clause statute that provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." A plaintiff may prevail on a claim for Title IX retaliation by establishing "that she engaged in activity protected by Title IX, that the alleged retaliator knew of the protected activity, that the alleged retaliator subsequently undertook some action disadvantageous to the actor, and that a retaliatory motive played a substantial part in prompting the adverse action."  *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002).  The sin qua none of a Title IX retaliation claim, therefore, is a complaint of a violation of Title IX and that is exactly what is missing in this case.

Nowhere in her complaint filed in this case or her motion does Plaintiff allege that the Cape Elizabeth School Department violated Title IX, nor does she articulate what Title IX violation A.M. was complaining about.

In fact, the statement on the sticky note – "THERE'S A RAPIST IN OUR SCHOOL AND YOU KNOW WHO IT IS," cannot, by any stretch of the imagination, be considered a

Title IX complaint.  There is nothing about that statement that suggests that the Cape Elizabeth School Department has discriminated against anyone on the basis of sex.  Rather, what the sticky note charges is that there is a dangerous criminal present in the school.

Nor could posting an anonymous sticky note be a legitimate means to make a Title IX complaint.  The School's Board's discrimination and harassment policies and procedures specify how a complaint of sex discrimination should be made: by reporting their concern to any staff member.  School Board Procedure ACAA-R.  A.M., according to her own statements, was very aware of the school policies.  If A.M. actually had information that the School Department was engaged in sex discrimination, she could have – and should have – communicated that information to the school by telling any staff member.  Yet she did not do that.  Instead, she chose to post an anonymous sticky note in a bathroom – where she knew it would be seen by students, not staff, -- accusing a fellow student of being a rapist.

The Supreme Court has explained "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination . . . retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).  Here, as detailed above and in the declarations of the school administrators involved, there is not one shred of evidence that A.M. was disciplined for complaining about sex discrimination.  Indeed, there is not one shred of evidence that anyone perceived that she complained about sex discrimination.  Rather, all of the evidence establishes that she was disciplined because her unfounded accusations against a fellow student that so severely and adversely affected him that he was unable to go to school.  That is not Title IX retaliation; it is responsible enforcement of the School Department's bullying policy and its obligations to

20

protect all students.  Plaintiff thus has no likelihood of succeeding on her Title IX retaliation claim.

## IV.    PLAINTIFF HAS NOT ESTABLISHED THAT A.M. WOULD BE IRREPARABLY HARMED IF A RESTRAINING ORDER IS NOT ISSUED

This Court has explained that "a showing of irreparable harm must be 'grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.'" *Maine Educ. Ass'n Benefits Tr. v. Cioppa*, 842 F. Supp. 2d 386, 387–88 (D. Me.), *aff'd*, 695 F.3d 145 (1st Cir. 2012) (quoting *Charlesbank Equity Fund II v. Blinds to Go*, 370 F.3d 151, 162 (1st Cir.2004)). "Thus, a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. A presently existing actual threat must be shown." Grounds for Granting or Denying a Preliminary Injunction—Irreparable Harm, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.).

In her motion, Plaintiff identifies the alleged harm to A.M. if an injunction is not granted as (1) an imminent suspension starting October 15, 2019,[9] and (2) remaining under a school warning "that any future actions of this sort . . . may result in further and more severe consequences up to and including suspension and possible expulsion." Pl. Br.  at 18.  Plaintiff argues that absent injunctive relief, she will lose her First Amendment freedoms, which will have a chilling effect for A.M. and other students. *Id.*  In fact, there is nothing irreparable about a suspension.  If this Court were to determine, after full consideration of the merits of Plaintiff's claim, that A.M. should not have been suspended, the suspension could be expunged from her record.  With respect to the second harm, Plaintiff does not accurately describe the school's

---

[9] The effective date of the suspension was delayed by agreement of the parties until after this Court has had a chance to rule on Plaintiff's motion.

warning, because she omits a significant portion—"She is hereby warned that any future actions of this sort, **directed to the student who was targeted in this instance or any other student**, may result in further and more severe consequences up to an including suspension and possible expulsion."  Complaint Exhibit B (emphasis added).  Thus, while the school's warning prohibits A.M. from targeting Student 1 or other students in the future in violation of the school's bullying policy, it in no way prohibits her from engaging in protected speech.  Plaintiff therefore cannot establish that she will suffer irreparable harm if a restraining order is not issued and her motion should be denied for that reason as well.

## V.   THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF

In *Epperson v. Arkansas,* 393 U.S. 97, 104 (1968), the United States Supreme Court warned that:

> Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities.

Plaintiff not only comes to the Court asking for judicial intervention in the operation of the Cape Elizabeth School Department, her request is directly contrary to the public policy of the State of Maine.  That public policy with regard to bullying has been established by the Maine legislature as follows:

> All students have the right to attend public schools that are safe, secure and peaceful environments.  The Legislature finds that bullying and cyberbullying have a negative effect on the school environment and student learning and well being.  These behaviors must be addressed to ensure student safety and an inclusive learning environment.

20-A M.R.S. §6554(1).  In this case, the experienced school administrators who undertook a careful investigation determined that A.M. bullied Student 1 and that as a result Student 1 could not come to school.  As Maine's bullying law requires, they took appropriate remedial action and

22

now Plaintiff's motion for a temporary restraining order requests that this Court rescind that action before a full consideration of this case on the merits.  Taking such action on an interim basis would be contrary to the public policy established by the Maine legislature, and would interfere with the ability of school officials to protect students from bullying.

## VI.   **PLAINTIFF SHOULD BE REQUIRED TO POST SECURITY**

Rule 65(c) of the  federal Rules of Civil Procedure states that "the court may issue a preliminary injunction or a temporary restring order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by the party found to have been wrongfully enjoined or restrained.  Plaintiff has not offered to post a bond but the Court should order her to do so if it grants injunctive relief in this case

## CONCLUSION

For all of the foregoing reasons, Plaintiff's motion for a temporary restraining order should be denied.

Dated:  October 17, 2018.

/s/ Melissa A. Hewey
Melissa A. Hewey
Attorney for Defendants

DRUMMOND WOODSUM
84 Marginal Way, Suite 600
Portland, ME  04101
(207) 772-1941
mhewey@dwmlaw.com

## CERTIFICATE OF SERVICE

I, Melissa A. Hewey, hereby certify that on October 17, 2019 I electronically filed the above Memorandum of Law in Opposition to Motion for Temporary Restraining Order with the Clerk of Court using the CM/ECF system which will send notifications of this filing to all parties of record.

_/s/ Melissa A. Hewey_
Melissa A. Hewey
Attorney for Defendants