UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| A.M., a minor, by and through her mother, SHAEL NORRIS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 2:19-cv-00466-LEW |
| CAPE ELIZABETH SCHOOL DISTRICT; DONNA WOLFROM, Superintendent of Cape Elizabeth Schools; JEFFREY SHEDD, Principal of Cape Elizabeth High School; and NATHAN CARPENTER, Vice Principal of Cape Elizabeth High School, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** [1]

In this action, as a preliminary matter, I am asked to temporarily stay school administrators from suspending a 15-year-old student because she posted a note in a Cape Elizabeth High School bathroom that read: "THERE'S A RAPIST IN OUR SCHOOL, AND YOU KNOW WHO IT IS."  The school administrators, Defendants in this action, argue I should deny the request for temporary relief because the student's expression is undeserving of protection under the First Amendment.  The student, Plaintiff in the action, argues just the opposite, that her expression rests comfortably within a category of speech presumptively deserving of protection.  Both parties believe they represent the kind of

---

[1] Plaintiff's motion (ECF No. 3) requests an emergency temporary restraining order or preliminary injunction.  Because the matter is decided following a hearing, the motion is construed as a request for preliminary injunction and the request for TRO is effectively moot.

"immediate overwhelming interest" that will brook no opposition, but not the kind of "immediate overwhelming interest that appeals to the feelings and distorts the judgment." *N. Sec. Co. v. United States*, 193 U.S. 197, 401 (1904) (Holmes, J.).[2] I, on the other hand, consider the issue a very close one.

For purposes of the motion for preliminary relief, I am persuaded that the Plaintiff has shown a fair likelihood of success on the merits because the record suggests (but does not conclusively establish) that the expressive activity the Defendants would punish was neither frivolous nor fabricated, took place within the limited confines of the girls' bathroom, related to a matter of concern to the young women who might enter the bathroom and receive the message, and was not disruptive of school discipline. For these reasons, and because the other injunctive relief factors also militate in favor of preliminary injunctive relief, Plaintiff's motion is GRANTED.

## LEGAL STANDARD

Injunctive relief is "an extraordinary and drastic remedy that is never awarded as of right." *Voice of the Arab World*, *Inc. v. MDTV Med. News Now*, *Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations and quotation marks omitted). "To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet*, *Inc. v. Rainbow Treecare Sci. Advancements*, *Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). As the party

---

[2] Plaintiff also advances a claim under Title IX. Because I find Plaintiff has met her burden to obtain a preliminary injunction on her First Amendment claim, I do not discuss the Title IX claim in this Order.

seeking injunctive relief, Plaintiff bears the burden of establishing that the factors weigh in her favor.  *Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 117, 119-20 (1st Cir. 2011).

"Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996).  On this issue "the district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'"  *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross–Simons*, 102 F.3d at 16).  The moving party's burden to show it is "likely to succeed" varies depending on the relevance of the remaining preliminary injunction factors.  If the party seeking injunctive relief fails to make a persuasive showing of likelihood of success, then generally the court acts within its discretion if it denies relief without addressing the remaining factors.  *New Comm. Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).  But the strength of the other three factors can lessen the movant's burden of showing "likelihood of success;" as other circuits to consider the issue have pointed out, "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, C.J.).[3]  That is to say, the more harmful it would be to upend the *status quo pendente lite*, and the more the

---

[3] *See also League of Women Voters of the United States v. Newby,* 838 F.3d 1, 6–7 (D.C. Cir. 2016) (applying the "sliding scale approach to weighing the four preliminary injunction factors"); *Reilly v. City of Harrisburg*, 858 F.3d 173, 178 (3d Cir. 2017), as amended (June 26, 2017); *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 37–38 (2d Cir. 2010).

public interest favors granting preliminary relief, the lighter movant's burden on showing likelihood of success.  Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co*., 572 F.3d 1, 14 (1st Cir. 2009).

## BACKGROUND

On September 16, 2019, A.M., a student at Cape Elizabeth High School, entered a girls' bathroom and placed a sticky note on a mirror reading, "THERE'S A RAPIST IN OUR SCHOOL AND YOU KNOW WHO IT IS."   Within minutes, another student discovered the note and brought it to the attention of school administrators.  However, later that day other female students engaged in copycat expression in another school bathroom.

Principal Jeffrey Shedd and Vice Principal Nate Carpenter instituted an investigation to determine authorship of the notes and who the notes might be referring to. In the course of their investigation they reviewed camera footage and determined that A.M. was the author of the initial note.  The investigation was quite extensive.  In all, Shedd, Carpenter and other members of the administration interviewed more than 40 students. Some of what they uncovered would be upsetting to certain students and their families and will not be recounted here.  On September 20, 2019, Defendant Shedd sent an email to the school community at large, to which he attached a letter "about an incident in school this week."

Needless to say, the wide-ranging investigation and letter stirred up the hornet's nest of gossip and rumor.  Eventually, a certain male student (identified by the parties as "Student 1") experienced what could be described as ostracism by his peers.  Upset by his

4

experience, Student 1 remained out of school for several days.  Student 1's family informed the School that they considered the entire incident to be a matter of bullying and the school administrators ultimately decided that they agreed with that characterization.

On October 4, 2019, A.M. spoke with the press about her expressive activity and her concern with the School's handling of sexual assault allegations.  Also on October 4, 2019, Defendants Shedd and Carpenter wrote a letter to A.M.'s family stating that A.M. "admitted and accepted responsibility for her actions."  In the letter he advised that it was his conclusion that A.M. bullied Student 1.  On that basis he imposed a three-day suspension and a warning "that any future actions of this sort . . . may result in further and more severe consequences up to and including suspension and possible expulsion."  While A.M. received a three-day suspension, the other girls received shorter suspensions.  The other girls either had not spoken with or were not featured by the press, although Defendants deny that this was a factor.

On October 9, 2019, Defendant Shedd wrote another missive to the community in which he summed up the investigation.  In it he described the students who authored the sticky notes as having good but misguided intentions.  He complained of the national attention the School had received, and he cast shame on members of the media who may have given any "credence" to the assertions contained in the sticky notes.  He observed that the students responsible would be given "second chances" and would be able, in their senior years, to request expungement of their suspensions provided they maintain good records in the meantime.

On October 11, 2019, Defendant Donna Wolfrom, Ed.D., Superintendent of Schools, sustained the suspension and warning and emphatically rejected A.M.'s contention that her expressive activity was protected by the First Amendment. Dr. Wolfrom informed A.M. that her suspension would commence October 15, 2019.

On October 13, 2019, A.M., by and through her mother, filed the instant civil action and requested a temporary restraining order or preliminary injunction. Defendants agreed to withhold enforcement of the suspension pending a hearing on the motion.

On October 21, 2019, I conducted a hearing on the motion. The parties have advanced their respective positions based entirely on argument, declarations and exhibits. The hearing was not testimonial.

## DISCUSSION

Plaintiff, A.M., has met her burden of showing that (1) she is reasonably likely to succeed on the merits of her First Amendment claim, (2) she will suffer irreparable harm absent interim relief, (3) the balance of equities tilts in her favor, and (4) it would serve the public interest to maintain the status quo until I can rule on the merits. *Arborjet,* 794 F.3d at 171. For those reasons, as discussed more thoroughly below, I will grant Plaintiff's motion and preliminarily enjoin Defendants from enforcing the punishment described in their letter dated October 4, 2019. *See* ECF No. 1-2.

### A.   LIKELIHOOD OF SUCCESS

At the crux of A.M.'s case is her federal civil rights claim under 42 U.S.C. § 1983, alleging that Defendants violated her First Amendment rights by punishing her for engaging in protected speech while at school. To carry the burden of showing she is "likely

6

to succeed" on this claim, she must show she will be able to prove "(1) she engaged in constitutionally protected conduct, (2) she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). The parties do not dispute the second two factors of this test, so Plaintiff's burden is only to show she engaged in constitutionally protected speech that Defendants did not reasonably regulate under established precedent.

## 1. Supreme Court Jurisprudence

Generally speaking, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002). Of course, there are exceptions. When acting as sovereign, the government is empowered to impose time, place, and manner restrictions on speech, *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), make reasonable, content-based decisions about what speech is allowed on government property that is not fully open to the public, *see Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 – 75 (1998), decide what viewpoints to espouse in its own speech or speech that might be attributed to it, *see Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2253 (2015), and categorically restrict unprotected speech, such as obscenity, *see Miller v. California*, 413 U.S. 15, 23 (1973).

Sometimes, however, the government acts as more than a sovereign. In those capacities, it not only retains its sovereign authority but also gains additional flexibility to regulate speech. *See In re Kendall*, 712 F.3d 814, 825 (3d Cir. 2013) (collecting examples).

One of those other capacities is K–12 educator.  Although "students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,'" the First Amendment has to be "applied in light of the special characteristics of the school environment" and thus students' rights to freedom of speech "are not automatically coextensive with the rights of adults in other settings." *Morse v. Frederick*, 551 U.S. 393, 396–97 (2007) (internal quotation marks and citations omitted).

The Supreme Court first expressed this principle nearly a half century ago.  In 1965, the United States deployed over 200,000 troops to Vietnam as part of Operation Rolling Thunder—and thus began our Nation's involvement in the Vietnam War. That war "divided this country as few other issues [e]ver have." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 524 (1969) (Black, J., dissenting).  Public opposition to the war made its way into schools, and in one high-profile case, a group of high-school and middle-school students wore black armbands to express their opposition.  *Id.* at 504 (majority opinion).  School officials adopted a policy prohibiting the armbands and suspending any student who refused to remove an armband when asked.  *Id.*  Some students refused and were suspended.  *Id.*  The Supreme Court upheld their right to wear the armbands in school. *Id.* at 514.  In doing so, it held that school officials may not restrict student speech without a reasonable forecast that the speech would either (1) substantially interfere with the requirements of appropriate school discipline or (2) invade the rights of others.  *Id.* at 513. Because the students' armbands were nothing more than the "silent, passive expression of opinion, unaccompanied by any disorder or disturbance on [the students'] part," the expressive conduct was protected by the First Amendment.  *Id.* at 508.

Since *Tinker*, the Supreme Court has identified three circumstances in which the government may restrict student speech, without the need to show a risk of substantial interference or invasion of the rights of others.  First, the government may categorically restrict vulgar, lewd, profane, or plainly offensive speech in schools, even if it would not be obscene outside of school.  *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. at 683, 685 (1986).  Second, the government may restrict speech that "a reasonable observer would interpret as advocating illegal drug use" and that cannot "plausibly be interpreted as commenting on any political or social issue." *Morse*, 551 U.S. at 422 (Alito, J., concurring); *see also id*. at 403 (majority opinion) ("[T]his is plainly not a case about political debate over the criminalization of drug use or possession.").[4]  And third, the government may impose restrictions on school-sponsored speech that are "reasonably related to legitimate pedagogical concerns"—a power usually lumped together with the other school-specific speech doctrines but that, strictly speaking, simply reflects the government's more general power as sovereign over government-sponsored speech.  *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

Because these narrower rules do not apply here, I will analyze whether A.M. has demonstrated a likelihood of success under the more speech-permissive standard of *Tinker*. Before I do so, some first principles deserve special mention.

The First Amendment creates "an open marketplace" in which differing ideas about political, economic, and social issues can compete freely for public

---

[4] Two justices concurred in the opinion, observing that the majority opinion "does not endorse the broad argument … that the First Amendment permits public school officials to censor any student speech that interferes with a school's 'educational mission[,]' [which] argument can easily be manipulated in dangerous ways" by school officials seeking to "inculcat[e]" their own "political and social views." *Morse*, 551 U.S. at 423 (Alito, J., concurring, joined by Kennedy, J.).

acceptance without improper government interference. The government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves. And the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed.

*Knox v. Serv. Emp. Int'l Union, Local 1000*, 567 U.S. 298, 309 (2012) (citations omitted). Because school administrators are tasked with the duty of overseeing the preparation of our youth for participation in the marketplace of ideas of a free and open society, it is important that administrators receive sufficient leeway to conduct their duties without unnecessary interference, but it is also important that they not be given leeway "to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) (upholding the right of students to be free from compelled participation in the flag salute). Under this system, therefore, "undifferentiated fear or apprehension" that a student's expressive activity will disturb others "is not enough to overcome the right to freedom of expression." *Tinker*, 393 U.S. at 508. Simply stated, students must be prepared for life in "this relatively permissive, often disputatious, society," *id.* at 509, and consequently it is necessary from time to time that a court countermand the action of a local school authority.[5]

    *Tinker* teaches that, "[i]n the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Id.* at 511. As a general principle, school administrators act within their authority

---

[5] "[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Kuhlmeier*, 484 U.S. at 273.

when they prohibit or punish expression that "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id.* at 509. This is the baseline *Tinker* standard – an inquiry into the likelihood that certain expressive activity will disrupt the ability of students to observe appropriate *discipline*, not the likelihood that a student might be offended or upset or might be distracted throughout the school day by reflection on the content of the expression.

### 2. Application of the *Tinker* Standard

In this case, Plaintiff A.M. alleges the School impermissibly punished her for engaging in core political speech "on one of the most pressing issues of our time—the prevalence of sexual violence and the danger of inaction by those in positions of power." Compl. ¶ 89.   She argues this violates her First Amendment rights under *Tinker*. Defendants counter that their disciplinary approach does not offend the First Amendment because, first, A.M.'s defamatory statement is not protected speech at all, and second, their response fits within both of *Tinker*'s justifications for limiting speech activity at school.  I will first address whether A.M.'s statement is protected by the First Amendment at all, then whether the School's discipline fits the justifications of *Tinker*.

### a. *Whether Plaintiff's Speech Falls under the Free Speech Clause of the First Amendment*

As a threshold matter, for Plaintiff to succeed on her claim, her speech must fall under the protection of First Amendment.  Defendants argue that the sticky note was defamatory – falsely accusing another student ("Student 1") of being a rapist – and as such is not protected by the First Amendment. *Time, Inc. v. Firestone*, 424 U.S. 448, 457 (1976); *Pan Am Sys., Inc. v. Atl. Ne. Rails & Ports, Inc.*, 804 F.3d 59, 65 (1st Cir. 2015).  For a statement

11

such as A.M.'s to be defamatory it must be "concerning another" and there must be "fault amounting at least to negligence on the part of the publisher." *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991). The record is not clear on either of these two points, and Defendants cannot convincingly show that the speech is otherwise undeserving of First Amendment protection.

Perhaps unintentionally nodding to the difficulty of their argument, Defendants note there is "relatively little case law addressing defamatory speech by students in school." Response at 15. Standing in the way of their argument is the significant factual dispute over whether A.M.'s note referred to Student 1. *Compare* Response at 16 ("The administration convincingly found, however, that the statement was in fact directed at Student 1") *with* A.M. Decl at ¶ 33 ("at the time I posted the sticky note, I did not even know about the alleged videos [depicting Student 1]"). And even assuming A.M. meant to target Student 1 directly, there is also a live factual dispute over whether A.M. acted negligently in posting the note at all. Reply at 13 ("[A.M.] made a statement…that she believed in good faith to be true of numerous perpetrators in the school."); *see also* Oct. 9 Shedd Letter (characterizing A.M. as "well motivated, with good intentions"). If these factual disputes resolve in favor of Defendants, they may well undermine Plaintiff's claim; but at this preliminary stage the evidence suggesting her speech *might* have defamed Student 1 is not enough to undermine a finding that she is otherwise likely to succeed on the merits of her First Amendment claim.

The record is a mixed bag regarding whether A.M.'s speech was defamatory but speaks much more clearly that A.M.'s sticky note was a political statement. The Supreme

Court "has frequently reaffirmed that speech on public issues is entitled to special protection" under the Free Speech Clause, *Connick v. Myers*, 461 U.S. 138, 145 (1983), and that "it is a prized American privilege to speak one's mind." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964).  In the school context, the Court in *Morse* upheld the school's speech restriction in part because the sign "BONG HiTS 4 JESUS" could not "plausibly be interpreted as commenting on any political or social issue," *Morse*, 551 U.S. at 422 (Alito, J., concurring), and it was "plainly not a case about political debate over the criminalization of drug use or possession." *Id*. at 403 (majority opinion).  Therefore, where the statement has no political valence, it entitles the speaker to less First Amendment protection.

Unlike the "bong hits" the plaintiff  in *Morse* suggested for Jesus, A.M.'s note speaks out on a topic that is decidedly political.  In analyzing whether a student's speech is protectable, I look at an objectively reasonable interpretation of the speech, not the speaker's motive.  *Morse*, 551 U.S. at 402.  That inquiry may be informed by context, including the identity of the speaker.  By raising the specter of a rapist in the school and the administration's knowledge of his or her presence, A.M.'s note expresses political advocacy on a question of significant public consequence.  Plaintiff insists she was commenting on "the crisis of sexual assault in public schools and the importance of appropriate school procedures to address it," which falls within the ambit of speech "commenting on a[] political or social issue." *Morse*, 551 U.S. at 422.  Her speech not only contributes to this "political debate" about how schools handle sexual assault, but, if true, highlights a real safety concern for the students of Cape Elizabeth High School.  Given

13

the political nature of A.M.'s speech, and the guidance from the Supreme Court that "freedom of speech ... guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment," *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978), I find A.M. likely engaged in speech protected by the First Amendment.

      *b.  Whether Defendants Lack a Substantial Justification for Punishing Plaintiff*

To overcome Plaintiff's First Amendment claim, Defendants must show their reason for suspending fits the recognized justifications in *Tinker*.  Under *Tinker*'s "general rule," the government may restrict school speech that threatens to "materially and substantially disrupt the work and discipline of the school" or "inva[des] the rights of others."  393 U.S. at 513; *see also Morse*, 551 U.S. at 403.  Other circuits to interpret this rule have required schools to show "a specific and significant fear of disruption, not just some remote apprehension of disturbance."  *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 926 (3d Cir. 2011).  Defendants argue they were justified in punishing A.M. under both *Tinker* justifications because A.M.'s sticky note "was inherently disruptive," Response at 10, "was in fact disruptive," *id.* at 13, and "interfered with the rights of another student," *id.* at 16.[6]  Based on the record as it currently stands, including several significant factual disputes between the parties, I find Plaintiff has sufficiently shown she is likely to succeed on her First Amendment claim despite Defendants' argument that their discipline is constitutional under *Tinker*.

---

[6] Defendants also argue the expression was defamatory, but I have already addressed that concern in my discussion.

i.  Substantial Disruption

Defendants maintain that the assertion, "THERE'S A RAPIST IN OUR SCHOOL," is so inherently disturbing that anyone who reads it would appreciate that school discipline would be disrupted.  In support of this interpretation, Defendants assert someone might believe an active rapist was presently "walking the halls of the school building."  Response at 10; Carpenter Decl. ¶ 6.  At this stage of the proceedings, suffice it to say it is unlikely that Defendants will persuade me to accept this interpretation as reasonable.  Students who seek to sound the hue and cry regarding an imminent threat in the school building do not do so by sticky note.

Defendants also argue that the sticky note actually disrupted school, justifying the punishment they meted out on A.M.  They point to three factors, which they believe add up to sufficient disruption for purposes of *Tinker*: the fear students experienced as a result of the "allegation that there is a rapist in the school," the intensive investigation the administration undertook as a result of the note, and the discomfort experienced by Student 1, whom Defendants believe was described in the note.[7]   Response at 9-14.  To show students experienced "fear" at A.M.'s note, the School points first to the "worried and concerned" student who in fact found the sticky note in the bathroom.  *Id.* at 13.  Then, when the Defendants investigated the rape allegation, they argue that "dissemination of the statement interrupted the work of administrators for multiple hours over many days, interrupted the school routines of the 47 students interviewed and spread fear in the student

---

[7] Because the third factor boils down to "inva[ding] the rights of other students," the second *Tinker* justification for punishing otherwise protected speech in schools, 393 U.S. at 513, I will discuss it later in the analysis.

body," resulting in further disruption. *Id.* In essence, the Defendants argue they are justified in punishing A.M. because her note caused certain students to feel temporarily upset or unsafe, and certain administrators to spend their time investigating her allegation. This is less "disruption" than the school in *Tinker* had forecast, and not enough to justify prohibiting otherwise protectable First Amendment activity.

Defendants' "disruption" ultimately fails to undermine Plaintiff's showing of likelihood of success, because the evidence of disruption is similar to that in *Tinker,* and less than the disruption other courts have found sufficient to silence speech. In *Tinker,* the black armbands "caused comments, warnings by other students, the poking of fun at them …a warning by an older football player that other, nonprotesting students had better let them alone," and the "wreck[ing]" of a math teacher's lesson period, none of which amounted to enough "disruption" to silence otherwise protected speech. *Tinker*, 393 U.S. at 517 (Black, J., dissenting). The cases Defendants cite to support their argument highlight that "disruption" usually refers to actual threats of harm or violence. Response at 11 (citing *Boim v. Fulton Cty. Sch. Dist.*, 494 F.3d 978, 983 (11th Cir. 2007) (holding that ten-day suspension of student who made threats of violence directed at her teacher in a notebook that she shared with a classmate was justified under *Tinker* as the threats were reasonably likely to cause a material and substantial disruption to the school) and *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 111, 123 (2d Cir. 2012) (holding disruption was reasonably forecast when student turned in an assignment stating "blow up the school with the teachers in it" even though student did not have capacity to carry out the threat and

argued that the statement was a joke)).[8]  Here, by contrast, there is no evidence that A.M.'s note incited violent behavior, as in *Boin*, or even "wrecked" any part of the academic schedule.  The Assistant Principal's characterization of certain students as concerned about the note, and testimony that administrators spent time investigating the note, does not add up to "disruption" under *Tinker* which would undermine Plaintiff's showing of likelihood of success at this preliminary stage.

### ii.  Invading the Rights of Others

Defendants also attempt to justify their punishment of A.M.'s speech because it invaded the rights of other students, specifically Student 1, the alleged target of the note. Defendants argue that "A.M.'s unfounded statement interfered with Student 1's reputational rights … and his right not to be bullied in school."   Response at 16.  This justification holds more water, in part, because it aligns with the actual reason the School suspended A.M.: for violating the School's bullying policy, as stated in the October 4, 2019 suspension letter sent to A.M.'s parents.  ECF No. 1-2 at 1.  But because there are significant factual disputes regarding A.M.'s alleged bullying and the attenuated causal relationship between her sticky note and the harm suffered by Student 1, I find that Defendants have failed to undermine Plaintiff's showing of likelihood of success on her First Amendment claim.

---

[8] Though Defendants also cite *Kowalski v. Berkeley Cty. Sch.*, 652 F.3d 565, 574 (4th Cir. 2011) (upholding a school's punishment for a student's web page falsely claiming that another student had genital herpes and was a "slut" and a "whore"), that case is distinguishable from A.M.'s speech here.  In *Kowalksi*, the speech was explicitly directed at another student by name, and had no redeeming political value.  Here, A.M.'s speech (at least arguably) did not target a specific individual and had a significant political angle.

Defendants first argue that because A.M. violated the School's bullying policy she therefore invaded the rights of Student 1 and her speech is not protectable under *Tinker*. In describing this justification, the Court in *Tinker* gave the example of a student who "accosted other students by pinning the buttons on them even though they did not ask for one." *Tinker,* 393 U.S. at 508 (citing *Blackwell v. Issaquena Cty. Bd. of Ed.*, 363 F.2d 749, 751 (5th Cir. 1966)). I consider here whether A.M. invaded another student's rights with a similar level of clarity and directness as the *Blackwell* student referenced in *Tinker*. At this preliminary stage, the record on the issue is decidedly mixed. For example, Defendants state that Plaintiff "admi[tted] that she intended to instill fear in the school" by posting the note. *See* Response at 11, citing Carpenter Decl. ¶ 14, Stankard Decl. ¶ 17. A.M., on the other hand, contends that "it was Principal Shedd who alleged that I was trying to instill fear. I did not say that was my intent." A.M. Decl. ¶ 41. A.M. also claims to have audio recordings of her meetings with administrators that refute Defendants' contention that she directed her note at Student 1. *Compare* A.M. Decl. ¶ 23 ("the declarations by the school administrators do not accurately relay what happened in [meetings dated September 17, September 26, and October 4]) *with*, *e.g.*, Stankard Decl. ¶ 15 ("During the interview, we asked A.M. what she had in mind when she wrote the note. In response, she named Student 1 and said that he was on her mind…"). Without a clear factual connection between A.M.'s note and Student 1, I cannot find that her sticky note "invaded" Student 1's rights under *Tinker*. Therefore, Defendants' adjudication that A.M. bullied Student 1 does not undermine Plaintiff's showing of likelihood of success on her First Amendment claim.

Defendants also stress that A.M. "egregiously minimizes the trauma she *caused* to

Student 1."   Response at 17 (emphasis added).  I highlight that particular word to pause on a troublesome point of Defendants' argument; though Defendants hastily point out that A.M. was adjudicated to have "bullied" Student 1 under Cape Elizabeth High School's bullying policy, they do not closely link her protected speech to the actual harm he suffered. *Id.* at 16-17.  In support of their argument, Defendants rely on cases like *Kowalski v. Berkeley County School*, where the court was "confident that Kowalski's speech caused the interference and disruption described in *Tinker*."  652 F.3d 565, 572 (4th Cir. 2011). In *Kowalski*, the speaker identified his target repeatedly, by name, using photographs to drive home the harmful message.  *Id.* at 573.  Here, however, A.M. posted a sticky note in the girl's bathroom that stayed up for a matter of minutes, did not specifically name an individual, did not use photos, and arguably targeted the administration—the "you" in the note—rather than the "rapist."  Because the record does not speak with any clarity that A.M.'s note, in fact, caused reputational and educational harm to Student 1, I find that Defendants have failed to undermine Plaintiff's showing of likelihood of success on her First Amendment claim by pointing to this second *Tinker* justification.

**B.    IRREPARABLE HARM**

To show she is entitled to preliminary injunctive relief, Plaintiff must also show she will suffer irreparable harm if the School imposes the punishment described in its October 4 letter.  ECF No. 1-2 at 1.  "'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages

remedy."[9] *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis. As the Supreme Court has explained, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). As a result, the First Circuit has held that "irreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim." *Sindicato Puertorriqueño de Trabajadores v. Fortuno*, 699 F.3d 1, 10 – 11 (1st Cir. 2012). Therefore, because I find that Plaintiff has carried her burden of showing she is likely to succeed on the merits, she has also shown irreparable harm. This factor weighs in favor of issuing a preliminary injunction.

## C.   BALANCE OF EQUITIES

To obtain preliminary injunctive relief, a Plaintiff must also show "a balance of equities in [her] favor." *Arborjet*, 794 F.3d at 171. This involves weighing "the balance of relevant hardships as between the parties." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 482 (1st Cir. 2009). The harm Plaintiff would suffer is twofold: she would miss three days of school and, most significantly, her ability to speak on the topic of sexual assault or serve as a victim advocate would be chilled. *See* Oct. 4 Letter (describing the three-day suspension and warning A.M. that "any future actions of this sort, directed to the student who was targeted in this instance or any other student, may result in further and more severe consequences up to and including suspension and **possible expulsion**")

---

[9] There is no claim for money damages in this action.

(emphasis added).  As the First Circuit has noted, this type of harm to First Amendment rights is significant, and the threat of expulsion – an extraordinary response for a student with no other disciplinary record – solidifies the significant chilling effect of the punishment.

I am not unsympathetic to the harms on the other side of the ledger.  As Defendants point out, "[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities."  *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).  And if A.M. in fact bullied Student 1, as the School found in its investigation, a preliminary injunction delays imposing this punishment.  However, justice deferred is not justice denied in this instance.  If they prevail, Defendants will be able to impose the same punishment against Student 1, just a few weeks or months later.  And, nothing about the preliminary injunctive relief I order in this case applies to other students, or the School at large; the administrators of Cape Elizabeth High School will still be able to enforce their bullying policy and maintain discipline in the School.  Therefore, because the only harm the School will suffer is a delay in punishing A.M., and because A.M. will suffer significant First Amendment harm if Defendants' punishment chills her from engaging in otherwise constitutionally-protected speech, I find that the equities weigh in favor of issuing preliminary injunctive relief.

## D.   PUBLIC INTEREST

An allegation of unlawful conduct is, generally speaking, not a worthy object of punishment unless the allegation is frivolous.  *Dixon v. Int'l Bhd. of Police Officers*, 504

F.3d 73, 86 (1st Cir. 2007).  Indeed, even in the context of prison administration, grieving a non-frivolous matter is a constitutionally protected exercise.  *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015).  *See also L'Heureux v. Ashton*, 76 F.3d 370 (1st Cir. 1996) (per curiam) (holding that a prisoner's advocacy on behalf of other inmates would not be a valid justification for transferring him to segregation).  Defendants argue, however, that it is how one goes about it that matters here.  They say Plaintiff did not channel her grievance through the proper channels.  But Plaintiff has a right to express her viewpoint, and if her viewpoint is non-frivolous and is delivered by a means that will not likely cause a breakdown in school discipline or invade the rights of another student, then it is not deserving of punishment.

That does not mean the public is compelled to celebrate Plaintiff's expression. Indeed, the public remains free to reject Plaintiff's viewpoint.  Nevertheless, the public has an interest in knowing that neither Plaintiff nor any other student who expresses a comparable view in similar fashion will be denied access to school simply because her viewpoint offends the sensibilities of school administrators.  Something more is necessary to justify punishment.  If school administrators receive carte blanche to tamp down and vet non-frivolous outcries on topics of social justice, expressed in areas generally associated with free student communication, where would that leave us?  Contemporary examples abound of betrayal of free speech principles to avoid ideas or speakers with whom we disagree.  Madison would recoil.  Individual liberty is both the cause and the result of personal fortitude.  "The greatness of America lies not in being more enlightened than any other nation, but rather in her ability to repair her faults."  ALEXIS DE TOCQUEVILLE,

DEMOCRACY IN AMERICA, VOLUME 1, CHAPTER XII, Saunders and Otley (1935).  That ability, in turn, depends on the free flow of ideas, especially those that are discomfiting. *United States v. Schwimmer*, 279 U.S. 644, 654 – 55 (1929) (Holmes, J.) ("[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought – not free thought for those who agree with us but freedom for the thought that we hate.").

To my view, the concern over the ability of students to express outrage over something happening in the school community gives rise to the concern expressed by Justice Alito and seconded by Justice Kennedy in *Morse*, that there should be "no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue," 551 U.S. at 422, based merely on concern over the school's ability to carry out is "educational mission," *id.* at 423.  Such a formulation of the test invites school administrators to "inculcate[e] … whatever political and social views" they hold to the detriment of student expression.  *Id.*  There is some evidence that this may be going on here.  Defendants have demonstrated a relatively intense desire to control messaging about the health of their high school environment and to demonstrate to the public at large that they have the matter well in hand.  They have even gone so far as to state that A.M.'s concerns lack factual support, although it is not apparent on this record that A.M.'s concerns are in fact frivolous.[10]

In short, the right of the public to hear or read expression concerning the operation

---

[10] During the motion hearing, Defendants made the startling argument that it does not matter for purposes of the First Amendment analysis whether A.M.'s statement that "there's a rapist in our school" was true or false.

of the public schools and the existence of dangers within the school environment may, at times, depend on the right of members of the student body to express themselves in the school environment without fear of retribution. The public interest is, accordingly, in league with the Plaintiff insofar as she asks that the suspension be stayed pending further consideration of her free speech claim.

For the foregoing reasons, Plaintiff's Motion (ECF No. 3) is GRANTED.

**SO ORDERED.**

**Dated this 24th day of October, 2019.**

/S/ Lance E. Walker
**LANCE E. WALKER**
**UNITED STATES DISTRICT JUDGE**